# THE STATE v. WALTER S. DIPLEY and GOLDIE SMITH, Appellants.

### Division Two, May 9, 1912.

1. **CIRCUMSTANTIAL EVIDENCE: Instruction: Accomplice.** Where there is any direct evidence an instruction on circumstantial evidence should not be given; and a statement by deceased in his dying declaration that "I guess they have got me" is direct testimony that both the principal and his accomplice took part in the homicide.

2. ———: **Must be Consistent.** Circumstantial evidence must be consistent with the guilt of the accused and inconsistent with any reasonable theory of his innocence.

3. ———: ———: **Conjecture: Accomplice.** A conviction of criminal participation in a homicide cannot be based on a mere conjecture that the accused so placed deceased at the dining table as to enable the principal to there kill him without peril to himself, there being no other fact upon which to base the conjecture except a bare statement in the dying declaration of deceased that "I guess they have got me," which the facts show was called forth by deceased's knowledge that the principal had been informed of deceased's insulting conduct towards the accused, and to which therefore little weight can be attached.

4. **SHERIFF: Disqualified to Summon Jury: Indiscreet Conduct.** Indiscreet conduct on the part of the sheriff, public and unconcealed, such as that, in response to a written invitation of an interested friend of deceased to visit his town and attend a moving-picture show, at which were exhibited pictures of deceased in a prize fight with another, he did so at his own expense, is not alone sufficient to authorize the Supreme Court to say that the refusal of the trial court to disqualify the sheriff was error, the rule being that the appellate court will not reverse the ruling of the trial court in such a matter unless the ruling amounted to an abuse of discretion.

5. **JURORS: Challenge.** A general request that certain jurors "be excused and discharged from the panel" made on their *voir dire* examination, is no challenge at all, and will not authorize their discharge. A specific ground of disqualification must be urged.

6. ———: **Examination Out of Order.** Where no objection was made to the examination of two talesmen out of their order on the list until after they had been examined, there was no reviewable error.

7. ————: **Number of Challenges.** Where more than one defendant are jointly tried in a murder case, each is not entitled to twenty peremptory challenges.

8. **EVIDENCE: Carrying of Weapon by Deceased: General Objection.** A statement of deceased as to why he was carrying a pistol is incompetent as hearsay, but not reversible error in this case for two reasons: first, the testimony was not objected to as hearsay, and a general objection is not sufficient; and, second, the statement was made by a State's witness on redirect examination, after defendant on cross-examination had brought out the fact that deceased had been carrying and shooting the pistol for the same purposes the statement indicated.

9. ————: **Dying Declaration: Credibility of Deceased.** When a dying declaration is admitted in evidence, the credibility of declarant may be attacked and sustained in the same way as may that of a living witness.

10. ————: **Impeachment: Judgment of Conviction in Another State.** A copy of a judgment of conviction rendered by a police judge of another State, adjudging deceased guilty of the offense of cruelty to animals, certified under the hand and seal of the police judge, but with no showing that the police judge was *ex officio* clerk of his court, nor of any other authentication of the judgment, is not authenticated in accordance with the requirements of the State and Federal statutes, and it is not error to exclude it.

11. ————: ————: **Rebuttal.** Testimony offered by defendant that deceased was a prize fighter and that he had made a criminal assault upon the female defendant, out of which the homicide grew, was such an attack upon the character of deceased as authorized the State to introduce testimony of his good moral character in support of the credibility of his dying declaration.

12. ————: **Dying Declaration: Admissibility.** The evidence showed that deceased while in the dining room was shot through the lung with a rifle, in the back, the ball entering below and near the shoulder-blade and about an inch from the spinal column; that the pleural cavity immediately began to fill with blood, making his breathing difficult; that when wounded, he did not leave the house to give the alarm but ran to his bed and did not leave it until removed by others to a hospital in another county; that within a half hour after he was shot, two physicians arrived and later another from the hospital town, but they were unable to give him relief; that after being removed to the hospital he died, within twelve hours after he was shot; that after he was wounded his condition continued to grow worse and he suffered great pain and was groaning; and that he could tell from his breathing that he was shot

State v. Dipley.

through the lung, and repeatedly stated, "I guess they have got me." *Held*, that his dying declaration was admissible in evidence.

13. ————: ————: **Instruction.** It is not error to refuse to instruct the jury that a dying declaration is or is not entitled to the same weight as the sworn testimony of a living witness.

14. **INSTRUCTION: Repeating.** Where the words "feloniously," "wilfully," "deliberately," etc., were properly defined in one instruction, it is not necessary to define them in each instruction in which they are used.

15. ————: **No Definition of "Sufficient Cause," "Provocation,"** etc. Where the court told the jury that the assault on the previous day upon the principal's supposed wife and his knowledge thereof, would not furnish a sufficient cause of provocation to reduce the killing to murder in the second degree, and there was no evidence of such just cause of provocation as would reduce the grade of the crime, the use of the words "without sufficient reason, cause, justification or excuse" and "lawful provocation," without defining them, was not error.

16. ————: **Self-defense.** An instruction telling the jury that if defendant voluntarily sought, provoked or invited the difficulty with the felonious intention of killing deceased or of doing him some great bodily harm, then he could not avail himself of the law of self-defense, is unobjectionable.

17. ————: **Refusal of Defendant's.** If proper instructions are given upon every question of law necessary for the information of the jury, it is not error to refuse all those asked by defendant, though they correctly declare the law.

18. **REMARKS OF COUNSEL: Addressing Juror by Name, etc.** The counsel for the State, in his argument to the jury, addressing a juror by name, said: "Mr. Barnard, it is not the first time in your knowledge that an unsuspecting victim was placed at a door or window where he could be shot; you know of a case where a man was placed at a window and foully assassinated." *Held*, highly improper, but as the court, upon objection, said the remarks were improper and admonished counsel to keep within the record, they were not prejudicial to the substantial rights of defendant.

Appeal from Webster Circuit Court.—*Hon. C. H. Skinker*, Judge.

AFFIRMED *as to appellant Dipley;* REVERSED *as to appellant Goldie Smith.*

*W. H. Rush, T. J. Delaney* and *Clay & Davis* for appellants.

(1) Defendants' request to instruct on all of the law, indicating in such request the particular points to be covered, is sufficient upon which to predicate error for non-instruction. Laws 1901, p. 140; State v. Weatherman, 202 Mo. 611; State v. Bond, 191 Mo. 555; State v. Chenault, 212 Mo. 132; State v. Barnett, 203 Mo. 657. Where instructions have been asked by defendant which are improper in form, this so far brings the matter to the attention of the court that it becomes the duty of the court to then give proper instructions. State v. Hendricks, 172 Mo. 670; State v. Moore, 160 Mo. 443; State v. Hawthorne, 166 Mo. 229; State v. Barton, 214 Mo. 316. (2) The court erred in admitting in evidence the declaration of Ketchel, as follows: "They got me." This evidence was admitted as a dying declaration, as shown by the record disclosing the examination by the court. It was improperly admitted as a dying declaration; none of the conditions existed justifying the statement as a dying declaration. In truth it was not a statement of any fact, or especially of any act done by Goldie Smith, but a mere conclusion signifying nothing that imports guilt. It is not a statement of any fact of the *res gestae*. State v. Parker, 172 Mo. 191; State v. Elkins, 101 Mo. 344; State v. Birks, 199 Mo. 263; State v. Partlow, 90 Mo. 608; State v. Parker, 96 Mo. 382; State v. Chambers, 87 Mo. 406; State v. Simon, 50 Mo. 370; State v. Kellerher, 201 Mo. 614. Even if such testimony were admissible as a dying declaration, the court should have declared the law thereon. The direct positive request was made by defendants upon the court so to do. When such evidence is admitted, it should be weighed with great caution, and the jury should have been so instructed. State v. Horn, 204 Mo. 546; State v. Parks, 172 Mo. 191. The

defendants requested the court to instruct on the law of dying declarations and the failure of the court to do so is error. This was done in a special request in writing. The failure of the court to so instruct was called to the attention of the court in the motion for a new trial, and exceptions to the action of the court were saved in the bill of exceptions. State v. Finley, 193 Mo. 202; State v. Cantlin, 118 Mo. 111; State v. Groves, 194 Mo. 452; State v. McGarver, 194 Mo. 717; State v. Bond, 191 Mo. 555; State v. Weatherman, 202 Mo. 6; State v. Chenault, 212 Mo. 132. (3) It is not sufficient to correctly state the law authorizing, on the producing of certain facts, a finding of guilt, or declaring a certain conclusion from the producing of certain facts. The other party is entitled to the converse proposition. Thus it is not sufficient to declare that if certain facts are found, the defendant is guilty. The converse should also be stated that unless certain facts are found, the defendant is not guilty. We were entitled to clear cut declarations on the law of threats, law of self-defense, law of good character, without the tailings which rob defendant of the force of such declarations. Harwood Co. v. Dent, 121 Mo. App. 108; State v. Shour, 196 Mo. 202; State v. Walker, 196 Mo. 73. (4) The instructions given by the court do not properly declare the law. Instruction 2 (a) does not explain or define the terms feloniously, wilfully, deliberately, etc.; (b) nor does it make reference to any other instruction by which these terms are defined; (c) it does not submit to the jury the question whether or not the defendant Dipley feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought shot deceased. State v. Emerich, 87 Mo. 110. Instruction 6 is erroneous in this: In addition to the use of the well understood terms "just cause, justification, extenuation or excuse," the further words are

242 Sup.—30

used "or sufficient reason." This term is not defined in any instruction. To a legal mind this might convey the same idea as the other clauses; but juries are not required to possess legal acumen, and the rights of a defendant are not to be jeopardized by putting up to them questions of construction. State v. Darah, 152 Mo. 532. This term leaves the jury to its own notions of what constitutes "sufficient reason." The use is not justified by precedent, and like all innovations is dangerous and likely to be misleading. Under such an instruction, the jury might well find there was "just cause or excuse" in *a legal sense* for the act of defendant Dipley, as those terms are defined by the court, and yet from their own personal views and opinions the *reason* for his conduct may not appear sufficient. To a layman, it must have a different meaning from the other terms, else why use it? What might appear to one mind as sufficient reason may not satisfy another; and where language used is susceptible of various meanings, the meaning intended should be defined. Instruction 10 does not correctly advise the jury how to weigh circumstantial evidence. It is not sufficient to advise the jury that "the evidence must be inconsistent with any reasonable theory of her innocence." It should have declared that such evidence must be strong enough "to exclude every reasonable hypothesis other than the guilt of defendant." Instruction 34 should have been given, as immorality does not impair the right of self-defense. This instruction tells the jury that the facts that Dipley was living in adultery and was a deserter did not impair his right of self-defense. Especially should this have been given for the State to be fair as prejudice naturally arose against defendants on account of the relations maintained.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1) The discretion of the trial court in refusing to disqualify a sheriff on motion of either side will not be disturbed on appeal unless the proof clearly shows an abuse of the trial court's discretion in such ruling. State v. Leabo, 89 Mo. 252; State v. Mathews, 98 Mo. 121; State v. Hultz, 106 Mo. 51; State v. Lanahan, 144 Mo. 38; State v. Hunter, 181 Mo. 333. (2) The statement made by deceased was before any trouble arose between him and Dipley. It was competent to show in proof that Ketchel was in the habit of carrying the pistol for target practice. This refuted the theory of the defense that he was only carrying the pistol on the morning of the shooting, anticipating trouble with Dipley, for the alleged insult offered to appellant Smith on the afternoon prior thereto. This assignment is without merit and should be ruled against appellants. (3) The dying declaration was properly admitted in evidence. All the physical facts show Ketchel had received a mortal wound and that death was on him in less than an hour after he was shot. These facts speak louder than mere words of deceased. The law of dying declarations recognize such to be the rule. State v. Brown, 188 Mo. 460-62; State v. Kelleher, 201 Mo. 637; State v. Craig, 190 Mo. 338-41; State v. Nocton, 121 Mo. 549; State v. Kelleher, 224 Mo. 145; State v. Gow, 235 Mo. 326.

KENNISH, J.—Upon an information charging murder in the first degree for the killing of Stanley Ketchel, appellants were tried and convicted of that offense at the January term, 1911, of the circuit court of Webster county, and were sentenced to imprisonment in the penitentiary for life. They appealed to this court.

The crime was charged to have been committed on the 15th day of October, 1910, at said county, by the

shooting of Ketchel with a rifle in the hands of the appellant Walter Dipley. Appellant Goldie Smith was charged as an accessory before the fact. No point is made on this appeal as to the sufficiency of the information.

The evidence tended to prove the following facts:

R. P. Dickerson, a resident of the city of Springfield, Missouri, owned a ranch in Webster county, upon which he employed four or five men, including a foreman. Stanley Ketchel was a noted young pugilist from Michigan. He had been visiting his friend Dickerson in Springfield for about two months preceding the homicide. It was understood that Bailey, the foreman of the ranch, was to quit the services of Dickerson and that Ketchel was to succeed him as foreman. Appellants were then respectively twenty-four and twenty-two years of age, Dipley being the older. They had been brought up in Christian county, which adjoins Webster county. They had known each other as school children, but both had left their home county a number of years before. Dipley had lived in Jasper county and had entered the naval service of the United States Government, while appellant Goldie Smith had also resided at a number of different places. She had been twice married and was not divorced from her second husband. She had been leading a wayward life, and Dipley was a deserter from the navy. Without pre-arrangement, on the 11th day of September, 1910, both had returned to Christian county to visit relatives and were thrown together in driving from the railway station to the neighborhood where their relatives resided. After recognition and a renewal of their acquaintance, it was agreed on the drive that they should represent themselves as husband and wife, and afterwards it was agreed that they should live in that relation and form it in fact as soon as Mrs. Smith was free to marry. After a short stay with their relatives they went to Springfield, repre-

senting themselves as husband and wife, under the as-
sumed name of Hurtz. They applied at an employ-
ment agency for a situation and were referred to
Dickerson, who was looking for a man and wife to
keep house and work on his ranch. They were em-
ployed and left Springfield in company with Dicker-
son and Ketchel for the ranch, October 12, 1910, ar-
riving there the same day about 12:30 p. m. Within
a radius of two hundred yards there were two small
dwelling houses on the ranch, and one larger house
where the foreman lived and in which Dickerson and
Ketchel had a room reserved for their own use; also
a large barn. Bailey had not removed all of his fur-
niture from the main house where appellants were to
reside and so they were placed temporarily in one of
the smaller houses about a hundred and fifty yards
distant. Dipley did not commence work for his em-
ployer until the next day. He worked Thursday and
Friday. On Friday he was in the field some distance
from the house, putting in wheat. Friday afternoon
Ketchel and appellant Mrs. Smith moved appellants'
effects from the smaller house to the larger one. That
evening after supper Dipley went to one of the other
houses in which Brazeal's family was living and where
Bailey was stopping for the night preparatory to leav-
ing the ranch the next day. He called Bailey out and
told him he expected to have trouble with Ketchel
and was going to quit the ranch and return to Spring-
field. He inquired if he and his wife could ride in
the hack with Bailey to the railroad station the next
day, and was informed that he could.

Appellants testified that soon after supper Fri-
day evening, Mrs. Smith warned Dipley to be on his
guard for Ketchel. That the latter had made bad
threats against both of them that afternoon. That
she then told Dipley she did not want to remain there
and that they decided to leave. They further testi-
fied that about midnight, at the solicitation of Dip-

ley as to what had happened, Mrs. Smith told him that while she and Ketchel were moving the goods that afternoon Ketchel assaulted her, throwing her upon the bed and partly accomplishing his purpose, and that he thereafter threatened that he would kill her and her husband if she should tell what he had done. Mrs. Smith testified to the truth of the facts so said to have been communicated to appellant Dipley.

Ketchel was fatally shot by Dipley the next morning at the breakfast table, between 6:30 and 7 o'clock. He was shot in the back with a rifle, below and near the shoulder-blade and about an inch to the right of the spinal column. The bullet ranged slightly upward and to the right, causing the pleural cavity to fill with blood and making it difficult for him to breathe. As soon as Ketchel was shot he ran through an adjoining room to his bedroom upon the west side of the house and lay down upon the bed. Some of the employees were soon there, ministering to him as best they could. In half an hour a physician arrived and later two physicians from Springfield, but they were unable to give him relief, and after having been removed to the hospital in Springfield he died there that day about 6:30 p. m.

After he was shot deceased made a statement which was admitted in evidence as a dying declaration. In this statement he said a number of times, "I guess they have got me," and also said, "Yes, he told me to put up my hands and I didn't do it and he shot me."

There was much testimony, direct and circumstantial, tending to prove that Dipley borrowed the rifle from Ketchel that morning, on the pretext that he wanted to shoot a groundhog or some other object, when his real purpose was in fact to kill Ketchel, and that after the shooting he gave as the reason for his act that Ketchel had assaulted his wife the day before. There was also evidence tending to prove that Dipley

followed Ketchel into his bedroom after he was shot and struck him on the forehead with the rifle and took from him a revolver which Ketchel was carrying on his person at the time he was shot.

Appellants' version of the shooting, briefly, in addition to the occurrences of the day before as heretofore stated, was to the effect that an altercation arose between Dipley and Ketchel when the latter sat down to his breakfast, because Dipley had not gone to work; that Dipley referred to Ketchel's misconduct of the day before; said he had quit; that Ketchel then threatened to shoot Dipley, and that the latter sprang and got the rifle and shot as Ketchel was trying to draw his revolver.

After the shooting Dipley left appellant Goldie Smith at Brazeal's and fled from the ranch, taking Ketchel's revolver with him. He was arrested at a farmer's house the next morning where, giving an assumed name, he had stopped over night.

. The foregoing is but a summary of the evidence, a detailed statement of which is not deemed essential and would unduly extend this opinion. Additional facts will be referred to when necessary in the discussion of the errors assigned.

I. At the close of all the testimony appellant Mrs. Smith requested an instruction in the nature of a demurrer to the evidence, which the court refused. In the motion for a new trial, as well as in one of the assignments of error in this court, it is urged that the court erred in refusing said instruction, and that the evidence is insufficient to support the verdict. That contention stands at the threshold of a consideration of the alleged errors, for if it should be sustained it removes from the case many of the grounds relied upon as reversible error.

The theory of the State was that the evidence of Mrs. Smith's guilt was entirely circumstantial, and the

jury was so instructed. In adopting that theory, little reliance was placed upon the words of the dying declaration, "I guess they have got me," for that is not circumstantial but direct testimony, and the rule is that where there is any direct evidence an instruction on circumstantial evidence should not be given. [State v. Crone, 209 Mo. 316.] But waiving the technical question suggested and viewing the testimony broadly, let us examine the record as to the facts and their probative weight tending to prove the criminal participation of this woman in the tragedy which resulted in Ketchel's death. And in considering the question we must do so mindful of the rule of law as recognized by the court in this case that circumstantial evidence must be consistent with the guilt of the accused and inconsistent with any reasonable theory of innocence.

At the outset we are confronted with the remarkable fact that although there were three eye witnesses to the homicide, each of whom was seen immediately thereafter by others than the parties to the tragedy, and talked about the facts, yet, aside from Ketchel's general words, "I guess they have got me," not one word was said by either tending to prove the woman's guilt. The most searching scrutiny of her conduct immediately after the homicide, is equally barren of any act indicating a consciousness of guilt. We are not disposed to attach much weight to the words of the victim, "I guess they have got me," so far as Mrs. Smith is concerned. It is evident that she told Dipley the evening before of some improper conduct of Ketchel toward her. This fact is proven by Dipley's visit to Bailey after supper, and by what he then said. The further fact that Ketchel was carrying a revolver in a scabbard, before breakfast and at the breakfast table, at the time of the homicide, has little less significance as to his knowledge. Ketchel knew Dipley and the woman as husband and wife. If, when

he made said statement, he was aware, as we think he was, that the woman had communicated to her supposed husband the information which caused the latter to shoot him, how natural that he should have used the words under review, without intending to implicate the woman as a party to the crime. Besides, when Ketchel stated the facts as to the shooting, there is no mention of any act or word connecting the woman with what had been done. The suggestion that she so placed Ketchel at the table as to enable Dipley to kill him without peril to himself, is the merest conjecture and wholly insufficient to support a conviction of the highest crime known to the law. Our conclusion is that as to the appellant Mrs. Smith the evidence is insufficient to support the verdict, and that the court should have given the instruction directing a verdict of acquittal.

II. The defendants filed a motion to disqualify the sheriff on the ground that he was prejudiced against them. After hearing testimony thereon the motion was overruled, and appellants now assign such ruling as error.

It was shown by the testimony that Dickerson was Ketchel's friend; that he was interested in the prosecution of the defendants; that a few days before the trial he wrote to the sheriff, inviting him and his friends to come to Springfield and attend a moving-picture show of the Johnson-Ketchel prize fight and that the sheriff and his friends attended the show in response to the invitation. But the sheriff testified that they paid their own expenses, and there was no testimony tending to show any attempt on the part of Dickerson to influence the sheriff in his official conduct. The *voir dire* examination of the jury is contained in the record and there is an absence of any testimony tending to show prejudice of the sheriff in summoning the jury, or in the discharge of his official

duties. While it must be said that it was a most indiscreet act in the sheriff to accept such an invitation under the circumstances disclosed, yet we cannot overlook the fact that the incumbent of that office may be and frequently is a man who has not the highest sense of propriety in such matters. And it does not follow that because of such conduct, public and unconcealed as it was, there was official wrongdoing, or that an inference should be drawn that the sheriff was prejudiced against the defendants and unfit to discharge the duties of his office in their case. The rule is well settled in this State that an appellate court will not reverse the ruling of the trial court in such a matter, unless the action reviewed amounted to an abuse of discretion, and clearly such a showing was not made in this case. [State v. Leabo, 89 Mo. l. c. 252; State v. Mathews, 98 Mo. l. c. 121; State v. Hultz, 106 Mo. l. c. 51; State v. Lanham, 144 Mo. l. c. 38; State v. Hunter, 181 Mo. l. c. 333.]

III. Complaint is made that the court refused defendants' request to disqualify jurors Heggan and Brown upon their *voir dire* examination. No reason was given for the challenge as to said jurors except the general request that they "be excused and discharged from the panel." Such a challenge does not direct the court's attention to the specific ground of disqualification and, under the repeated rulings of this court, is no challenge at all. [State v. Fields, 234 Mo. l. c. 622; State v. Wooley, 215 Mo. 620; State v. Bobbitt, 215 Mo. 10.]

IV. It is claimed that the court erred in permitting the examination of certain talesmen before two others whose names appeared earlier on the list. Also that the court erred in not allowing each of the defendants twenty peremptory challenges. As to the former complaint it is sufficient to say that no objection was made to the order of examination until after the

juror had been examined, and that no possible preju-
dice could have resulted from the action of the court
complained of; and as to the latter, that the statute,
section 5224, Revised Statutes 1909, expressly denies
the right asserted.

V.  A number of errors are assigned to the rul-
ings of the court in the exclusion and admission of
testimony over the defendants' objections.  We have
carefully examined such rulings and have concluded
that they are free from prejudicial error.  Space for-
bids that we should take up each of these complaints,
and we shall therefore notice only those of most merit.

A witness for the State had been cross-examined
by defendants' counsel upon the subject of the de-
ceased carrying a revolver upon his person, and an
unfavorable inference was sought to be created by
such fact.  The prosecuting attorney, on redirect ex-
amination, asked the witness if he knew why the de-
ceased carried a gun.  No objection was made to this
question, but when the witness answered that the de-
ceased said he carried it to practice target shooting
and that he was ambitious to become a good shot, the
defendants then objected to the testimony and asked
that it be stricken out for the reason that it was in-
competent, irrelevant and immaterial.  The court re-
fused to strike out the answer, and appellants assign
error in such ruling.

It is competent for the accused, in a homicide case,
to prove why he was carrying a weapon at the time
of the encounter, in order to negative a criminal pur-
pose.  [State v. Kretschmar, 232 Mo. 29.]    But it
would not be competent to prove such fact by state-
ments made by the defendant when he was not under
oath, and we have been unable to find any exception
to the rule against hearsay which would make Ketch-
el's statements competent as to why he carried a

weapon. However, the ruling of the court cannot be held prejudicial error, for two reasons:

First: The defendants did not object to the evidence for the reason that it was hearsay, and a general objection was not sufficient to direct the attention of the court to such ground of incompetency. [State v. Pyles, 206 Mo. l. c. 632.]

Second: The fact had been brought out by the defendants, on the cross-examination of the State's witnesses, that the deceased had been carrying the same revolver around there and shooting with it before the difficulty with the defendants. Therefore the answer asked to be stricken out was merely a restatement of the same matter brought out by defendants, and we are unable to see how they could have been prejudiced by such testimony.

The defendants offered in evidence a certified copy of a judgment of conviction rendered by a police court in the State of Montana, against Ketchel, for the offense of cruelty to animals, which, upon objection by the State, the court excluded. The State offered evidence tending to prove Ketchel's good character for morality at Springfield, where he had resided for about two months, which evidence the court admitted over defendants' objection, and appellants now complain of both of said rulings.

When a dying declaration is admitted in evidence, the credibility of the declarant may be attacked and sustained as in the case of a living witness. Under this rule it was competent for the defendants to attack Ketchel's reputation and for the State in turn to sustain it. A witness may be impeached by proving that he was convicted of a criminal offense. The purported transcript of the judgment offered in evidence was certified under the hand and seal of the police judge. There was no showing that the police judge was ex-officio clerk of his court, nor was there other authentication of the judgment. The transcript of the

judgment was not authenticated in accordance with the requirements of the State or Federal statutes, and the court did not err in excluding it. [Section 6331, Revised Statutes 1909; Section 905, vol. 3, p. 3711; Revised Statutes of Missouri 1909 (Sec. 905, U. S. Compiled Statutes 1901); Stevens v. Oliver, 200 Mo. 492; State v. Foreman, 121 Mo. App. 502; Crone v. Dawson, 19 Mo. App. 214.]

The defendants' testimony tending to prove that Ketchel was a prize fighter and the assault upon Goldie Smith, was such an attack upon his character as authorized the State to introduce testimony of his good moral character in support of his credibility. [State v. Lovitt, 243 Mo. 510; State v. Speritus, 191 Mo. 24; State v. Jones, 191 Mo. 653; Underhill on Criminal Evidence (2 Ed.), sec. 418.]

VI. It is contended that the court erred in admitting the alleged dying declaration in evidence, for the reason that it was not shown by the testimony that the declaration was made under the belief of impending death.

It was in evidence that the deceased was shot through the lung and that the blood commenced flowing into the pleural cavity immediately, thereby making his breathing difficult. That when wounded, deceased did not go outside of the house to give the alarm, but ran to his bed and did not leave it until removed by others. That his condition continually grew worse and he was suffering great pain and was groaning. That he said he could tell from his breathing that he was shot through the lung, and repeatedly stated, "I guess they have got me." These facts and others detailed by the witnesses proved that the declarant believed he was fatally wounded and that he was conscious of the near approach of death. All the requirements of the law as to the admissibility of a dying declaration were met by the facts and circum-

stances in evidence, and we hold the court did not err in admitting it. [State v. Lovell, 235 Mo. 343; State v. Gow, 235 Mo. 307; State v. Kelleher, 201 Mo. 614.]

VII.   Defendants requested the court to instruct the jury upon certain questions of law, including the law upon dying declarations, and they now complain that the court failed to instruct upon the subject of such testimony.

This court has held it error to instruct that a dying declaration is entitled to the same credibility as if the declarant had been examined under oath as a witness and testified in court to the same facts.  [State v. McCanon, 51 Mo. 160; State v. Vansant, 80 Mo. 67.] On the other hand, it was held in the case of State v. Reed, 137 Mo. 125, that the court did not err in refusing an instruction asked by the defendant telling the jury that such declarations were not entitled to the same weight as the testimony of the declarant, were he a witness testifying in court.  It was further held in the Reed case that such an instruction would have been objectionable as a comment upon the evidence. Under these authorities the court properly refused to give the instruction requested.

VIII.   Many errors are assigned to the giving of instructions for the State.  The main complaints are lodged against instructions numbered 2, 6, 7, 14 and 15.

Number 2 is attacked upon the ground that it does not define the adverbial terms "feloniously," "wilfully," "deliberately," etc., and because it does not submit to the jury the question whether or not the defendant Dipley "feloniously, wilfully," etc., shot the deceased.

The words referred to were properly defined in instruction numbered 5, and it was not necessary to

define them in each instruction in which they were used. [State v. Renfrow, 111 Mo. 589.]

The second complaint as to said instruction numbered 2 is not borne out by the facts in the record. The instruction, in form, is in accord with approved precedents of this court.

Instructions numbered 6 and 7 are criticized because of the use therein of the words "without sufficient reason, cause, justification or excuse," and "lawful provocation," without defining them.

In instruction numbered 7 the court correctly told the jury that the assault upon Goldie Smith the day before the homicide, and the defendant Dipley's knowledge of that fact, would not furnish a sufficient cause or provocation to reduce the killing to murder in the second degree. And as there was no evidence of such just cause of provocation as would reduce the grade of the crime, a failure to define said terms was not error. [State v. Ellis, 74 Mo. 207; State v. Grant, 152 Mo. 57.]

Instruction numbered 6 is substantially a copy of an instruction approved by this court in the case of State v. Cushenberry, 157 Mo. 168, and number 7 is in accord with the law as declared in the cases of State v. Ellis and State v. Grant, supra.

Instruction numbered 14 contains the principle of the law of homicide that if the defendant Dipley voluntarily sought, provoked or invited the difficulty with the felonious intention of killing Ketchel or of doing him some great bodily harm, then he could not avail himself of the law of self-defense. Complaint is made both as to the form of this instruction and that there was no evidence on which to base it.

The instruction is unobjectionable in form. [State v. Bailey, 190 Mo. 257.] Without repeating the testimony bearing upon this subject, already set forth in the statement of facts herein, it is sufficient to say that in our opinion the court was fully warranted in

giving this instruction.   [State v. Kretschmar, 232 Mo. 29.]

IX.   Thirty-six instructions were asked by the defendants and refused by the court.   Proper instructions were given to the jury upon every question of law necessary for their information, and it is well settled that when correct instructions are given it is not error to refuse others, though they correctly declare the law.   [State v. Driscoll, 235 Mo. 377; State v. Gow, 235 Mo. 307; State v. Sharp, 233 Mo. 269.]

X.   It is finally urged as error that counsel for the State made improper and prejudicial remarks in the argument of the case to the jury.   Mr. Haynes, counsel for the State, in his argument, addressing a juror by name, said:   "Mr. Barnard, it is not the first time in your knowledge that an unsuspecting victim was placed at a door or window where he could be shot; you know of a case where a man was placed at a window and foully assassinated."   Upon objection by counsel for defendants the court said the remarks were improper and admonished counsel to keep within the record.   The defendants objected and saved their exceptions.   While the remarks of Mr. Haynes were highly improper, yet, as the court promptly so characterized them in the hearing of the jury and admonished counsel to keep within the record, we are of opinion that, considered in connection with the corrective action of the court, they were not prejudicial to the substantial rights of the defendants and a reversal of the judgment would not be warranted on that ground.

The other remark complained of, to the effect that the eyes of the people of Webster county and of the United States were upon the jury to see if they were going to do their duty and convict the defendants, was a mere rhetorical appeal to the jury such as is com-

monly made in the trial of criminal cases. The court admonished counsel that the remarks were improper and that he must keep within the record. Without passing upon the question as to whether such admonition was deserved, we have no hesitancy in holding that the remark did not constitute reversible error.

After a painstaking examination of the long record in this case and the numerous errors assigned, we have reached the conclusion that as to appellant Walter Dipley the record is free from prejudicial error and the judgment is accordingly affirmed. As to appellant Goldie Smith, for the reasons heretofore stated, the judgment is reversed and the appellant Goldie Smith is discharged. *Ferriss, P. J.,* and *Brown, J.,* concur.