**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Stanley Howard SHIVES,
Defendant-Appellant.**

**No. KCD 30332.**

Missouri Court of Appeals,
Western District.

June 9, 1980.

William P. Russell, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., Jefferson City, Earl W. Brown, III, Philip M. Koppe, Asst. Attys. Gen., Kansas City, for plaintiff-respondent.

Before CLARK, P. J., and DIXON and SOMERVILLE, JJ.

SOMERVILLE, Judge.

Defendant was indicted for murder, first degree ("felony" murder). Sections 559.007 and 559.009, RSMo Supp. 1975, and Section 556.170, RSMo 1969. A jury found defendant guilty and fixed his punishment at life imprisonment. Judgment and sentence were entered and pronounced accordingly.

Defendant raises eight diverse points on appeal: (1) there was no "substantial" evidence to support the guilty verdict; (2) the trial court erred in overruling defendant's motion to suppress the indictment because the grand jury failed to keep any minutes of its proceedings; (3) the trial court erred in giving Instruction No. 5, the state's principal verdict-director, because it failed to specify the time of day the offense was committed in view of defendant's asserted

alibi defense; (4) the trial court erred in sustaining the state's objection to defendant's introduction of the results of a polygraph examination; (5) the trial court erred in overruling defendant's motion to suppress an oral inculpatory statement made by defendant because it was obtained under "coercive" circumstances and was thereby involuntary; (6) the trial court erred in permitting defendant's accomplice to testify on behalf of the state; (7) a "representative jury panel" was not provided from which to select the petit jury which tried the case; and (8) the trial court erred in overruling defendant's "Motion to Reconsider" because "fairness and humane treatment demanded" that defendant should not have received a sentence "disproportionate" to those received by certain of his accomplices.

In view of defendant's broadside attack on the sufficiency of the evidence, the following facts are gleaned from a lengthy transcript. The jury could have reasonably found that around 7:00 P.M. on the evening of January 22, 1977, defendant and a companion named Joe Hatton had the latter's girl friend "case" the victim's house in Columbia, Missouri, to see if he was there alone. The victim was a reputed drug dealer in the Columbia area. Prior to that evening defendant, Joe Hatton, Eugene Clay and Ricky Christian had discussed robbing the victim and "pulling" a "drug-rip-off". Upon being advised that the victim was alone in his house, defendant and Hatton contacted Christian and Clay and the four proceeded to the victim's house, arriving there about 8:00—8:15 P.M. Defendant was armed with a .308 caliber rifle and Clay was armed with a .22 caliber revolver. The defendant and Clay entered the victim's house through the back door and Hatton and Christian were supposed to enter through the front door. While defendant was searching the victim's house for "reefers and money", Clay encountered the victim inside the house. Several shots were fired at the victim from inside the house. The victim then "bolted" the house through the front door with Clay, and eventually the defendant, in pursuit. Hatton and Christian were outside the front door of the

victim's house at that time and they grappled with the victim in an attempt to stop him. As they were doing so Clay and the defendant burst out onto the front porch and Clay shot twice at the victim with his .22 caliber revolver and defendant shot once at the victim with his .308 caliber rifle. The victim "went down" in the front yard of the house. Defendant, Clay, Hatton and Christian then went back inside the victim's house and discovered some cash and marijuana which they took. After leaving the victim's house the "loot" was "cached" at Clay's home and the four then went their separate ways. The victim was wounded twice in the abdomen and once in the leg. He was taken to the Boone County Hospital in a critical condition and later removed to the Veterans Administration Hospital in Columbia, Missouri, where he succumbed on February 27, 1977. Expert medical testimony disclosed that a massive hemorrhage precipitated by the abdominal gunshot wounds was the cause of the victim's death. Two "slugs" were observed in the victim's abdominal area. One was removed but the other was left intact. The "slug" which was removed was identified as a .22 caliber "slug".

The hard core evidence in the state's case came from Columbia police officers who testified as to an oral inculpatory statement made by defendant, and from Hatton and Christian, two of defendant's accomplices. Defendant, who took the stand in his own behalf, denied the oral inculpatory statements attributed to him by the police officers, denied any knowledge of the offense, and said that he was at the Boone County Hospital when the offense occurred.

█ In determining the sufficiency of the evidence to support defendant's conviction, all the evidence and all favorable inferences to be drawn therefrom must be considered in the light most favorable to the state and all evidence and inferences to the contrary must be disregarded. *State v. Franco*, 544 S.W.2d 533, 534 (Mo. banc 1977), *cert. denied* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977); *State v. Chase*, 444 S.W.2d 398, 401 (Mo. banc 1969); and

*State v. McGlathery,* 412 S.W.2d 445, 447 (Mo.1967). When this legal template is superimposed upon the facts heretofore iterated it is patent that the evidence amassed by the state against the defendant was overwhelming and substantial and defendant's cry of a lack of substantial evidence to support the guilty verdict has a legally hollow ring. Defendant's first point (1) is rejected.

Defendant's next point (2) charges that the trial court erred in overruling defendant's motion to "suppress the indictment" because "the unavailability of the grand jury proceedings shackled [defendant's] efforts to properly prepare his defense." At the outset it should be noted that the record discloses that the grand jury which indicted defendant kept no minutes of its proceedings. Defendant seizes upon its failure to do so as an impregnable ground for quashing the indictment. The reasoning and argument advanced by defendant assumes that the grand jury was charged with a positive duty to keep minutes of its proceedings. This assumption is fallible for a number of reasons. Sections 540.100 and 540.105, RSMo 1978, are the only statutes found which bear on the issue. Section 540.100, *supra,* so far as here pertinent, provides that "[e]very grand jury *may* appoint one of their number to be a clerk thereof, to preserve minutes of their proceedings *and of the evidence given before them . . . .*" (Emphasis added.) Section 540.105, *supra,* so far as here pertinent, provides that "[t]he official reporter of the circuit court, *when directed by the judge thereof,* shall take down and transcribe . . . any or all evidence given before the grand jury." (Emphasis added.) In view of the language employed in these statutes, cast as they are in discretionary and permissive terms, one cannot read into them a positive command that grand juries *shall* keep minutes of their proceedings however desirable doing so might be. Defendant, with commendable candor, mentions both of these statutes in the argument portion of his brief and in doing so states that "the law of Missouri imposes no duty to take minutes of the Grand Jury proceedings." Rule 25.03(A)(3), relating to disclosure by the state to a defendant without court order, recognizes, at least inferentially, the discretionary or permissive, as opposed to positive, nature of these statutes by providing that the state, upon proper request, is only required to disclose to a defendant "[t]hose portions of any *existing* transcript of grand jury proceedings which relate to the offense with which defendant is charged, containing testimony of the defendant and testimony of persons whom the state intends to call as witnesses at a hearing or trial." (Emphasis added.) Although making reference solely to Section 540.105, *supra, State ex rel. Dunlap v. Hanna,* 561 S.W.2d 411, 412 (Mo.App.1978), holds that any duty resting upon a grand jury to record evidence presented before it "must be imposed by the legislature" and Section 540.105, *supra,* is permissive rather than mandatory. Defendant attempts to breathe life into his second point (2) by ascribing constitutional overtones of denial of "due process" to the grand jury's failure to keep minutes of its proceedings. Doing so fails to revitalize this point. It has been held that the failure of a grand jury to keep minutes of its proceedings does not constitute a denial of "due process". *United States v. Huckensteine,* 475 F.2d 1131, 1132 (8th Cir. 1973); *United States v. Gray,* 464 F.2d 632, 635 (8th Cir. 1972); and *United States v. Harflinger,* 436 F.2d 928 (8th Cir. 1970), *cert. denied* 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971). Defendant's second point (2) affords no basis for relief.

Alleged error on the part of the trial court in giving Instruction No. 5, the state's principal verdict-director, because of its failure to circumscribe the time of the offense to a precise hour of the day, is the crux of defendant's next point (3). In view of the limited nature of defendant's attack on Instruction No. 5, it is unnecessary to quote said instruction in its entirety. Tersely put, Instruction No. 5 referred to the time of the occurrence of the offense as "on or about January 22, 1977". Defendant made no specific objection to Instruction No. 5 at the time of trial or in his motion

for new trial. Instead, he chose, on both occasions, to make a general objection devoid of any semblance of specificity. Rule 20.03 (now Rule 28.03) provides that "specific objections to given or refused instructions and verdict forms shall be required in motions for new trial unless made in the record at the time of trial. . . ." By virtue of defendant's noncompliance with Rule 20.03 (now Rule 28.03) the alleged error he now seeks to rely upon was not preserved for review. *State v. Young*, 534 S.W.2d 585, 589 (Mo.App.1976), and cases therein cited. Defendant has not asked this court to review this point (3) as "plain error" under Rule 30.20 and this court declines to do so sua sponte. This court notes, ex gratia, that even if this point (3) had been preserved for appellate review no error attached to Instruction No. 5. Briefly, defendant argues that the failure of Instruction No. 5 to narrow the time of the occurrence of the offense to between 8:00 P.M. and 8:30 P.M. on January 22, 1977, nullified his alibi defense which was submitted to the jury by Instruction No. 8 (MAI–CR 3.20).[1] Defendant makes no claim that time was of the essence of the offense for which he stood trial. The testimony of various witnesses for the state fixed the time of the offense as occurring between 8:00 P.M. and 8:30 P.M. on the night of January 22, 1977. In sharp contrast thereto, defendant took the stand and testified that he was at the Boone County Hospital from approximately 5:00 P.M. until approximately 10:00 P.M. on January 22, 1977. Defendant also called as witnesses the mother and brother of Eugene Clay, both of whom testified that they were in the presence of and saw defendant at the Boone County Hospital from approximately 7:40 P.M. until approximately 9:00 P.M. on the night of January 22, 1977. Under sharply analogous facts, the accused in *State v. Graves*, 588 S.W.2d 495 (Mo. banc 1979), claimed, among other things, that the state's verdict directing instructions (three in number by reason of a multiple count information) nullified his alibi defense since they did not circumscribe the time of day

the alleged offenses occurred. In rejecting this claim the court held, 588 S.W.2d at 498, that "[t]he evidence before the jury clearly contrasted the time of the alleged offense and the alibi defense of appellant" and it was "not a case where the jury could believe that the defendant was where his alibi defense and corroborating witnesses placed him and still believe that the defendant committed the crime in question", and therefore the failure of the state's verdict directing instructions "to circumscribe the time of day the alleged . . . offenses were committed did not nullify the appellant's alibi defense." The same is true in the instant case, and even if the alleged error asserted by defendant had been preserved for appellate review it would not have afforded any basis for relief.

Defendant's next point (4) charges that the trial court erred in sustaining the state's objection to defendant's introduction of the results of a polygraph examination into evidence. It is necessary to lay a background to put this point in proper perspective. This point rests, at best, on an anemic record. The transcript on appeal shows the following sequence of events and nothing more: prior to trial the prosecuting attorney called the trial court's attention to a motion for a protective order which the state had filed to suppress "any discussion in front of the jury about a polygraph"; the text of the state's "motion for a protective order" was not included in the transcript; nevertheless, the trial court apparently indicated that it would take the motion with the case; during the trial several passing references were made by defendant on direct examination to a polygraph examination to which the prosecuting attorney objected and requested the trial court to "take cognizance of my protective order previously filed in this case"; the requests to do so were "noted" by the trial court at one point and at another point by advising defendant's counsel that "you are aware of the rulings of this court earlier . . . (and) I presume that question is asked in

---

1. Defendant *specifically* requested this particular alibi instruction.

good faith"; moments later the defendant stated that "he took a polygraph test" and an "objection" by the prosecuting attorney thereto was sustained and the jury was instructed "to disregard the witness's last answer . . ."; the subject of the polygraph examination was then dropped and never referred to again until defendant filed his motion for new trial. It is equally important to mention certain salient matters which are nonexistent as a matter of record: there is no indication that the trial court expressly ruled on the state's motion for a protective order; there is no indication that a stipulation was entered into between the state and defendant that the latter would submit to a polygraph examination and that the results could be introduced into evidence; there is no indication that the results of the purported polygraph examination were favorable to defendant, favorable to the state, or inconclusive. Moreover, defendant made no offer of proof that he submitted to the alleged polygraph examination pursuant to a stipulation that the results, if favorable to defendant, could be introduced into evidence, and that the results of the alleged polygraph examination were in fact favorable to him.

On appeal, defendant, dehors the record, compulsively argues in his brief that he submitted to the alleged polygraph examination per a stipulation between himself and the state as to the admissibility of the results at trial if favorable to him and that the results were, in fact, favorable to him. The state, candidly admitting that its basis for doing so was dehors the record, retaliated by arguing in its brief that the state had not, in fact, entered into a stipulation with defendant that the results of a polygraph examination taken by defendant could be introduced and admitted into evidence either by the state or by the defendant, and moreover, that the results of the polygraph examination were inconclusive.

 Even if the inconclusive status of the record is bent in favor of defendant, it is the general rule in this state that the results of polygraph examinations are inadmissible in evidence because they lack scientific support for their reliability. *State v. Weindorf*, 361 S.W.2d 806, 811 (Mo.1962); *State v. Cole*, 354 Mo. 181, 188 S.W.2d 43, 51 (1945); and *State v. Jacks*, 525 S.W.2d 431, 435 (Mo.App.1975). Defendant principally relies upon *State v. Fields*, 434 S.W.2d 507 (Mo.1968). Much of the confusion resulting from *State v. Fields, supra*, as to the admissibility or non-admissibility of the results of polygraph examinations, even though the parties have stipulated as to their admissibility, has been laid to rest by the recent majority opinion of the Supreme Court of Missouri in *State v. Biddle*, 599 S.W.2d 182 No. 61784, handed down May 17, 1980: "We reaffirm our decision in *State v. Cole, supra*, and continue to hold that polygraph examination results lack wide scientific approval of their reliability and are inadmissible as evidence in the courts of this state. We reaffirm the statement in *State v. Fields, supra*, limiting that decision to the issue regarding a voluntary and intelligent waiver of a constitutional right against self-incrimination and we hold erroneous any interpretation of the *Fields* case which holds that polygraph evidence otherwise inadmissible for unreliability can be made admissible through a stipulation of the parties." Defendant's fourth point (4) is rejected under the authority of *State v. Biddle, supra*.

Defendant's next point (5) charges the trial court with error for refusing to suppress an oral inculpatory statement made by defendant to several Columbia police officers during the course of their investigation of the homicide. The gravamen of the charge is that the statement was coercively obtained from defendant, thereby rendering it involuntary, notwithstanding the fact that he was given a proper "*Miranda* warning". Defendant's position is somewhat paradoxical since he took the stand on his own behalf during the trial, and, although he admitted talking to the officers, he categorically denied that he made the inculpatory statement attributed to him by their testimony. Moreover, this point (5) is elusive, to say the least, because the ground upon which it purports to rest has noticeably shifted from the pre-trial stage to the appellate stage.

Defendant's point (5) centers on an oral incriminatory statement made in the presence of three Columbia police officers in St. Louis, Missouri, on October 3, 1977. A pre-trial motion filed by defendant to suppress the oral incriminatory statement was overruled after an evidentiary hearing. The pre-trial motion to suppress was premised on the ground that the interrogating officer had failed to give him a "*Miranda* warning". On the basis of the evidence presented the trial court ruled that defendant had been given a full bloom "*Miranda* warning", that he acknowledged and understood the same, and that he knowingly, intelligently and voluntarily waived his right to remain silent. Defendant made no objection during trial to the officers' testimony concerning the oral inculpatory statement. The circumstances under which it was obtained were recounted in considerably more detail both on direct and cross-examination. The jury, via MAI–CR 3.44, was instructed on the issue of the voluntariness of the controversial statement and told to disregard it and give it no weight if they didn't believe that defendant made it or if they did not believe that it was freely and voluntarily made under all the circumstances. Defendant addressed the matter in his motion for new trial as follows: "The court erred in overruling defendant's Motion to Suppress oral statements purported to have been made by defendant." Any contention that the oral inculpatory statement was coercively obtained, thereby rendering it involuntary, was broached for the first time on appeal. It is plain to see that the issue sought to be raised by defendant's fifth point has not been properly preserved for appellate review. *State v. Hulsey*, 557 S.W.2d 715, 719–20 (Mo.App.1977). However, the constitutional implications of this point argue in favor of looking at it under the auspices of the "plain error" rule. Rule 30.20. The record in its entirety unequivocally discloses that an extensive, drawn out investigation conducted by the Columbia police department eventually pointed to defendant as one of the perpetrators of the homicide. In particular, Joe Hatton had confessed to the police and fully implicated

defendant in the crime. Although defendant was living in Columbia at the time of the homicide, he subsequently moved and was living in St. Louis, Missouri, on October 3, 1977. Three members of the Columbia police department drove to St. Louis to interview defendant on October 3, 1977. They located defendant during the early part of the afternoon working at a gasoline service station and told him that they would like to discuss the "Rowlison murder" case. Seeing that defendant was busy with his work they did not pursue the discussion at that time. Instead, they asked defendant what time he got off from work. Upon being told that he got off from work around 4:00 P.M. the officers told him they would come back at that time. After the officers left, defendant called his mother. The officers returned around 4:00 P.M. and defendant voluntarily accompanied them to a St. Louis police department precinct station where he was interrogated in a "conference room" by one of the officers in the presence of the other two officers. Before the interrogation began defendant was given a "*Miranda* warning" and he acknowledged that he understood his rights and waived them. The interrogation lasted approximately one hour and fifteen minutes. According to the state's evidence the defendant freely and voluntarily discussed his involvement in the crime in considerable detail, although he refused to sign a written statement. Defendant, who took the stand and testified on his own behalf during the trial, gave substantially the same version of the circumstances surrounding his interrogation on October 3, 1977, except he vehemently denied making any inculpatory statements, maintained he told the officers that he was at the Boone County Hospital at the crucial time in question, and repeatedly denied that he was in any way involved in the homicide. During the course of his testimony defendant did not so much as hint or suggest that he was subjected to any physical coercion during the interrogation. He did, however, testify that the officers attempted to lead him to believe that certain of his accomplices had already implicated him and that

he might as well confess. Defendant's testimony in this respect stands in stark relief as the only hint or suggestion that an attempt might have been made to subject him to some subtle form of psychological coercion. Defendant quickly nullified any pretense that he might have been subjected to some subtle form of psychological coercion by testifying that he made no inculpatory statements and that he persistently denied that he knew anything about the homicide. At the time of the trial, March 2–3, 1978, defendant was twenty-two years old. He had attended school through the eleventh grade and, as evidenced by his testimony, he was articulate and mentally bright. The jury obviously disbelieved defendant's testimony that the officers extracted a confession from him by exercising some subtle form of psychological coercion and likewise disbelieved his testimony that he made no inculpatory statements. The trial court, consistent with *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and in accordance with *State v. Hunter*, 456 S.W.2d 314, 316 (Mo.1970), determined in the first instance that defendant's oral inculpatory statement made on October 3, 1977, was voluntary. Evidence pertaining thereto at trial substantiated rather than contradicted its voluntariness, the jury was properly instructed on the issue, and defendant's belated contention on appeal that it was purportedly obtained by some subtle form of psychological coercion is not supported by the record.

■ Defendant complains (6) that the trial court erred in permitting certain accomplices, namely Joe Hatton and Ricky Christian, to testify on behalf of the state. Defendant summarily refers to the relationship between himself, Hatton and Christian as that of "co-indictees". After doing so he cites and apparently relies upon Section 546.280, RSMo 1969, which has been construed as prohibiting a defendant jointly charged with others from testifying on behalf of the state in the separate trial of a co-defendant. *State v. Blevins*, 427 S.W.2d 367, 369 (Mo.1968). The statute cited by defendant is inapplicable by reason of the fact that defendant, Hatton and Christian were not "co-indictees" in the statutory sense as each was separately charged as opposed to being jointly charged in the same indictment returned against defendant. The statutory prohibition against a "co-indictee" or "co-defendant" testifying against another "co-indictee" or "co-defendant" does not apply where they are charged in separate indictments or informations. *State v. Haynes*, 510 S.W.2d 423, 424 (Mo. 1974); *State v. Nickens*, 581 S.W.2d 99, 101–02 (Mo.App.1979); and *State v. Gant*, 586 S.W.2d 755 (Mo.App.1979). Defendant also attempts to paint the testimony of Hatton and Christian with reversible error because of certain promises of leniency made to them by the prosecuting attorney in return for their testimony. It is obvious that defendant labors under a basic misconception. Any bargain struck between the state and Hatton and Christian did not render their testimony per se inadmissible. *State v. White*, 126 S.W.2d 234, 235 (Mo. 1939); and *State v. Morris*, 518 S.W.2d 79, 81 (Mo.App.1974). It was however a vital consideration affecting their credibility and the trial court placed no restraints on defense counsel's probe of the matter on cross-examination of the respective witnesses. *State v. Summers*, 506 S.W.2d 67, 73 (Mo.App.1974). It was bared to the jury in its entirety and it was the prerogative of the jury to assess the credibility of said witnesses. *State v. Morris, supra*; and *State v. Huffer*, 424 S.W.2d 776 (Mo.App. 1968). Defendant's sixth point (6) fails to demonstrate any reversible error.

■ Defendant's seventh point (7) exemplifies a far too prevalent pattern which has recently surfaced—attacking for the first time on appeal the racial composition of juries on constitutional grounds without the benefit of any evidence of record for their support. The courts of this state still hew to the principle that to preserve constitutional questions for appellate review, save those attacking the constitutionality of an ordinance or statute on which a prosecution is based [*State v. Mitchell*, 563 S.W.2d 18 (Mo. banc 1978)],

they must be "raised at the earliest time consistent with good pleading and orderly procedure and must be kept alive during the course of the proceedings." *State v. Wickizer*, 583 S.W.2d 519, 523 (Mo. banc 1979). See also *State v. Flynn*, 519 S.W.2d 10, 12 (Mo.1975). Defendant's constitutionally rooted attack on the composition of the jury panel from which the petit jury which tried him was selected is a model of non-compliance with this well established principle. Treating the matter as "plain error" under Rule 30.20 is no catholicon for the infirmities which beset this point (7). The record before this court is totally blank both as to the racial composition of the petit jury which tried defendant and the jury panel from which it was drawn. Although defendant baldly asserts that both the petit jury which tried and convicted him and the jury panel from which it was selected were racially imbalanced under constitutional standards, nothing exists of record to support such assertions. Assertions on appeal lacking crucial factual support reflected by, contained in, or made a part of the officially accepted transcript present nothing for appellate review. *State v. Burrington*, 371 S.W.2d 319, 320–21 (Mo.1963). For want of an adequate record appellate review of point (7) is precluded even under the aegis of "plain error".

■ Defendant's final point (8)—that "fairness and humane treatment demanded" that defendant should not have received a sentence disproportionate to those received by certain of his accomplices—is so lacking in lucidity as to be virtually imperceivable. No authority has been cited by defendant in support of point (8). Defendant attempts to vitalize this point (8) by laconically arguing that his life sentence vis-a-vis reduced charges filed against Hatton and Christian was "cruel and inhumane". Less severe sentences meted out to accomplices of an accused for the same offense do not abridge any constitutional right. *State v. McCaine*, 460 S.W.2d 618, 621 (Mo.1970); *State v. Brownridge*, 459 S.W.2d 317, 319 (Mo.1970); and *Sheilds v. State*, 491 S.W.2d 6, 9 (Mo.App.1973). See also *Mixen v. United States*, 338 F.Supp.

672, 674 (E.D.Mo.1971), *aff'd* 469 F.2d 203 (8th Cir. 1972), *cert. denied* 412 U.S. 906, 93 S.Ct. 2297, 36 L.Ed.2d 971 (1973), holding that imposition of a lesser sentence on an accomplice who pled guilty and testified against an accomplice who chose to stand trial and was convicted and received a more severe sentence did not constitute error. Defendant's final point (8) is not well taken.

Judgment affirmed.

All concur.